UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION


ANTHONY LAVON AUSTIN,

                Plaintiff,

v.                                    Case No. 3:18-cv-484-J-34MCR

DR. DANA BARNES, et al.,

                Defendants.

───────────────────────────

**ORDER**

**I. Status**

Plaintiff Anthony Lavon Austin, an inmate of the Florida penal system, initiated this action on April 12, 2018, by filing a pro se Civil Rights Complaint (Doc. 1). He filed an Amended Complaint (AC; Doc. 5) with exhibits (Docs. 5-1 through 5-16) on May 25, 2018. In the AC, Austin asserts claims pursuant to 42 U.S.C. § 1983 against the following Defendants: (1) Dr. Dana Barnes, M.D.; (2) Detective E. Valerio, Jacksonville Sheriff's Office (JSO); (3) JSO Detective G. Thompkins; (4) JSO Detective J.E. Bisque; (5) JSO Detective Z.M. Anderson; (6) Dr. Kuhn, M.D.; and (7) JSO Officer Kerns.[1] He alleges that the Defendants violated his federal constitutional rights when Thompkins used excessive force against him during an April 11, 2014 arrest, and Barnes, Valerio, and Anderson denied him

─────────────

[1] The Court dismissed Austin's claims against Defendants Kerns, Bisque, and Kuhn on January 8, 2019. See Order (Doc. 33).

timely and proper medical care. As relief, he seeks compensatory, punitive, and nominal damages.

This matter is before the Court on Defendants Valerio and Anderson's Motion to Dismiss (Motion; Doc. 21), Thompkins' Motion to Dismiss (Thompkins Motion; Doc. 34), and Barnes' Motion to Dismiss (Barnes Motion; Doc. 35). The Court advised Austin that granting a motion to dismiss would be an adjudication of the case that could foreclose subsequent litigation on the matter, and gave him an opportunity to respond. <u>See</u> Order (Doc. 9). Austin filed responses in opposition to the Motions, <u>see</u> Responses (Docs. 36, 42, 43), and the Motions are ripe for review.

## II. Plaintiff's Allegations[2]

As to the underlying facts of his claims, Austin asserts that a JSO narcotics takedown team arrested him on Friday, April 11, 2014, after Defendant Thompkins, posing as a drug user, tried to buy marijuana from him. <u>See</u> AC at 5. He states that he told Thompkins that he did not sell drugs, was on worker's compensation, and ultimately would need a job. <u>See</u> <u>id.</u> According to Austin, he

---

[2] In considering a motion to dismiss, the Court must accept all factual allegations in the AC as true, consider the allegations in the light most favorable to the plaintiff, and accept all reasonable inferences that can be drawn from such allegations. <u>Miljkovic v. Shafritz and Dinkin, P.A.</u>, 791 F.3d 1291, 1297 (11th Cir. 2015) (quotations and citations omitted). As such, the recited facts are drawn from the AC and may differ from those that ultimately can be proved. Additionally, because this matter is before the Court on motions to dismiss filed by Valerio, Anderson, Thompkins, and Barnes, the Court's recitation of the facts will focus on Austin's allegations as to these Defendants.

heard screeching car tires and accelerated engines, and saw masked officers pointing guns at him. See id. He avers that he "attempted to run to the officers," as he screamed "my arm[,] my arm" before they could hurt him. Id. He maintains that "Thompkins placed his foot out in front of [Austin] to trip [him], and [Austin] "fell hard to the ground" on his "already injured shoulder." Id. Austin avers that Officer Bisque put his knee in the middle of Austin's lower back, yanked Austin's arms "real hard" behind his back, placed zip ties on his wrists, and picked him up off the ground. Id. According to Austin, Defendant Anderson interviewed him, and Defendant Valerio transported him to the Duval County Jail (Jail) instead of an emergency room. See id. at 6. He states that he explained to an intake nurse that he had undergone shoulder surgery on his acromioclavicular (AC) joint on March 18, 2014, and was still on worker's compensation as a result of a January 2, 2014 accident at his job site. See id. at 6-7. He asserts that the nurse gave him two Tylenol, and advised that the doctor would determine if he needed to go to the hospital. See id. at 6.

Austin further asserts that, the following week, he saw Defendant Barnes, who permitted him to have an "ultra-sling II" (brace) that Dr. Murphy at Heekin Orthopedics had prescribed for him after the March 18th surgery. Id. He avers that he saw Dr. Toole, an orthopedic doctor, on May 2, 2014, at Shands of Jacksonville (Shands). See id. at 7. According to Austin, Dr. Toole

3

reviewed his January 2, March 18, and March 30, 2014 x-rays, and explained that Austin needed surgery for his new injury, a broken collar bone. See id. Austin states that Dr. Toole "placed an order" on August 10th for him to undergo clavicle surgery, but JSO denied it. See id. According to Austin, Barnes gave him Tramadol in August 2014, however, he had an allergic reaction, so she recommended Naproxen, to which he had another allergic reaction. See id. at 8. He avers that Barnes gave him Tylenol at a follow-up appointment, and explained that they do not provide narcotics due to the potential of dependency. See id. Austin states that another Shands orthopedic doctor took an x-ray in September 2014, and advised him that Dr. Toole had erred to the extent that Austin had a re-injury to his AC joint, not a clavicle separation. See id. He maintains that the Shands doctor recommended exercises, told him that they do not perform re-injury surgeries, and advised Austin to stop wearing the brace to avoid shoulder stiffness. See id.

Austin asserts that he reported to the Jail's medical clinic on October 8th, at which time Barnes informed him that a Shands doctor advised that Austin should not wear the brace. See id. at 8-9. He avers that Barnes asked him to remove the brace and surrender it to her for placement with Austin's other property. See id. at 9. Austin maintains that he told Barnes that he would not surrender the brace to her until Dr. Murphy recommended that he no longer wear it. See id. Austin states that, as he departed the room,

4

Barnes "yelled to [two officers who were sitting by her door] to take the brace." Id. He avers that one officer "tackled" him to the ground, and the other officer twisted his arm and fingers. Id. He states that both officers kicked him in his testicles, and kneed him in the lower back, as they tried to retrieve the brace from him. See id. Austin asserts that other officers handcuffed him and "dragged" him onto the elevator where the officer who initially tackled him punched his stomach and rammed his head into the elevator wall. Id. According to Austin, the officer continued to assault him as they exited the elevator, and later claimed that Austin had spat on him. See id. He asserts that a sergeant placed a spit guard on his face, and officers put him in a restraint chair with his hands handcuffed behind him. See id.

Next, Austin maintains that the Jail's nurse neither addressed his complaints of back, head, and neck pain nor treated his injuries. See id. at 10. He states that officers took him to mental health confinement without any medical attention. See id. He declares that he went to Shands on October 10th for follow-up orthopedic care. See id. He avers that officers transported him to the custody of the Florida Department of Corrections (FDOC) on December 3, 2014. See id. Austin blames Barnes for "neglecting" to send [his] medical records" to support Austin's asserted need for a bottom bunk pass, walker, wheelchair, and/or cane that the FDOC ultimately denied him. See id. According to Austin, "[e]verybody

that got off the bus at Butler [(Reception and Medical Center in Lake Butler, Florida)] had their medical records except [him]." Id.

### III. Motion to Dismiss Standard

In ruling on a motion to dismiss, the Court must accept the factual allegations set forth in the complaint as true. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n.1 (2002); see also Lotierzo v. Woman's World Med. Ctr., Inc., 278 F.3d 1180, 1182 (11th Cir. 2002). In addition, all reasonable inferences should be drawn in favor of the plaintiff. See Randall v. Scott, 610 F.3d 701, 705 (11th Cir. 2010). Nonetheless, the plaintiff must still meet some minimal pleading requirements. Jackson v. Bellsouth Telecomm., 372 F.3d 1250, 1262-63 (11th Cir. 2004) (citations omitted). Indeed, while "[s]pecific facts are not necessary[,]" the complaint should "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)). Further, the plaintiff must allege "enough facts to state a claim that is plausible on its face." Twombly, 550 U.S. at 570. "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).

A "plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" Twombly, 550 U.S. at 555 (internal quotations omitted); see also Jackson, 372 F.3d at 1262 (explaining that "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal") (internal citation and quotations omitted). Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions[,]" which simply "are not entitled to [an] assumption of truth." See Iqbal, 556 U.S. at 678, 680. Thus, in ruling on a motion to dismiss, the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face[.]'" Id. at 678 (quoting Twombly, 550 U.S. at 570). And, while "[p]ro se pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed," Tannenbaum v. United States, 148 F.3d 1262, 1263 (11th Cir. 1998), "'this leniency does not give the court a license to serve as de facto counsel for a party or to rewrite an otherwise deficient pleading in order to sustain an action.'" Alford v. Consol. Gov't of Columbus, Ga., 438 F. App'x

837, 839 (11th Cir. 2011)[3] (quoting <u>GJR Invs., Inc. v. Cty. of</u> <u>Escambia, Fla.</u>, 132 F.3d 1359, 1369 (11th Cir. 1998) (internal citation omitted), <u>overruled in part on other grounds as recognized</u> <u>in</u> <u>Randall</u>, 610 F.3d at 706).

## IV. Summary of the Arguments

In the Motions, Defendants maintain that Austin fails to assert facts to state plausible claims against them for violation of the Fourteenth Amendment, <u>see</u> Motion at 4-6; Barnes Motion at 2-5, and Fourth Amendment, <u>see</u> Thompkins Motion at 2-5. Additionally, Defendants assert that they are entitled to qualified immunity. <u>See</u> Motion at 6-8; Barnes Motion at 5-6; Thompkins Motion at 5. In response to the Motions, Austin maintains that he has sufficiently stated federal constitutional claims against the Defendants, and that they are not entitled to qualified immunity. <u>See</u> Docs. 36, 42, 43.

## V. Discussion

### A. Fourth Amendment Excessive Use of Force

In the AC, Austin asserts that Defendant Thompkins used excessive force during the course of his April 11, 2014 arrest when Thompkins tripped him, causing Austin to fall on the ground and re-

---

[3] "Although an unpublished opinion is not binding . . . , it is persuasive authority." <u>United States v. Futrell</u>, 209 F.3d 1286, 1289 (11th Cir. 2000) (per curiam); <u>see</u> <u>generally</u> Fed. R. App. P. 32.1; 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

injure his shoulder. See AC at 5-6. Defendant Thompkins maintains

that Austin fails "to state any facts showing that [he] used

unreasonable force under the circumstances." See Thompkins Motion

at 3. In response, Austin argues that Thompkins' reliance on Graham

v. Connor, 490 U.S. 386, 395 (1989), and McCullough v. Antolini,

559 F.3d 1201, 1206 (11th Cir. 2009), is "misplaced" to the extent

that the caselaw does not "justify" Thompkins' conduct. Response

(Doc. 42) at 2. Austin states that sale of cocaine is not a crime

of violence, and the State never charged him with resisting arrest.

See id. at 3. He also asserts that none of the officers stated that

he was aggressive or violent. See id. He concludes, in pertinent

part:

> Although [D]efendant Thompkins['] counsel
> is correct that Defendant Thompkins didn't
> have to accept at face value the Plaintiff's
> scar and his statement ("my shoulder," my
> shoulder")[4] which could be considered as a
> warning of a medical condition, this does not
> excuse[] Defendant Thompkins['] actions of
> tripping the Plaintiff with his leg so the
> Plaintiff fell to the ground injuring his
> shoulder[.] [I]t does not excuse Detective
> Thompkins['] failure to alert the arresting
> officers of the Plaintiff's medical condition
> or disability in order to prevent the
> [un]reasonable and unwarranted infliction of
> pain, and lastly, it does not excuse[]
> Defendant Thompkins['] failure to ensure that
> the Plaintiff received the appropriate medical
> treatment when advised by the Plaintiff about
> the injury and aggravation of his needs at the
> time of arrest where [it] is evident that all

---

[4] See AC at 5 (stating that Austin screamed "my arm[,] my
arm"); see also Response (Doc. 42) at 3 (same).

9

> the officers involved acted with wanton and
> reckless disregard of the Plaintiff's
> condition and violated his constitutional
> protection against arrest and detention
> without probable cause.

Id. at 4.

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that (1) the defendant deprived him of a right secured under the United States Constitution or federal law, and (2) such deprivation occurred under color of state law. Salvato v. Miley, 790 F.3d 1286, 1295 (11th Cir. 2015); Bingham v. Thomas, 654 F.3d 1171, 1175 (11th Cir. 2011) (per curiam) (citation omitted); Richardson v. Johnson, 598 F.3d 734, 737 (11th Cir. 2010) (per curiam) (citations omitted). Additionally, the Eleventh Circuit requires "'an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation' in § 1983 cases." Rodriquez v. Sec'y, Dep't of Corr., 508 F.3d 611, 625 (11th Cir. 2007) (quoting Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986)). In the absence of a federal constitutional deprivation or violation of a federal right, a plaintiff cannot sustain a cause of action against the defendant.

To assert a valid Fourth Amendment claim for excessive force by a law enforcement officer in the course of effectuating an arrest, a plaintiff must allege that the officer's conduct was objectively unreasonable. See Graham, 490 U.S. at 395-97. In determining the reasonableness of the force applied, the Court

examines "the fact pattern from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balanc[es] the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate." McCullough, 559 F.3d at 1206 (citing Scott v. Harris, 550 U.S. 372, 383 (2007)). The Supreme Court has instructed:

> Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of "'the nature and quality of the intrusion on the individual's Fourth Amendment interests'" against the countervailing governmental interests at stake. Id.,[5] at 8, 105 S.Ct., at 1699, quoting United States v. Place, 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983).

> . . . .

> [The] proper application requires careful attention to the facts and circumstances of each particular case, **including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.** See Tennessee v. Garner, 471 U.S., at 8–9, 105 S.Ct., at 1699–1700 (the question is "whether the totality of the circumstances justifie[s] a particular sort of ... seizure").

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. See

---

[5] Tennessee v. Garner, 471 U.S. 1 (1985).

> Terry v. Ohio,[6] supra, 392 U.S., at 20–22, 88
> S.Ct., at 1879–1881.

> . . . .

> With respect to a claim of excessive force,
> the same standard of reasonableness at the
> moment applies: "Not every push or shove, even
> if it may later seem unnecessary in the peace
> of a judge's chambers," . . . violates the
> Fourth Amendment. The calculus of
> reasonableness must embody allowance for the
> fact that police officers are often forced to
> make split-second judgments — in circumstances
> that are tense, uncertain, and rapidly
> evolving — about the amount of force that is
> necessary in a particular situation.

> [T]he "reasonableness" inquiry in an excessive
> force case is an objective one: the question
> is whether the officers' actions are
> "objectively reasonable" in light of the facts
> and circumstances confronting them, without
> regard to their underlying intent or
> motivation. See Scott v. United States, 436
> U.S. 128, 137–139, 98 S.Ct. 1717, 1723–1724,
> 56 L.Ed.2d 168 (1978); see also Terry v. Ohio,
> supra, 392 U.S., at 21, 88 S.Ct., at 1879 (in
> analyzing the reasonableness of a particular
> search or seizure, "it is imperative that the
> facts be judged against an objective
> standard"). An officer's evil intentions will
> not make a Fourth Amendment violation out of
> an objectively reasonable use of force; nor
> will an officer's good intentions make an
> objectively unreasonable use of force
> constitutional. See Scott v. United States,
> supra, 436 U.S., at 138, 98 S.Ct., at 1723,
> citing United States v. Robinson, 414 U.S.
> 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973).

Graham, 490 U.S. at 396-97 (emphasis added).

---

[6] Terry v. Ohio, 392 U.S. 1 (1968).

Very recently, the Eleventh Circuit Court of Appeals addressed an arrestee's 42 U.S.C. § 1983 claim alleging that JSO officers violated his Fourth Amendment rights when they employed excessive force in effectuating his arrest. See Hinson v. Bias, No. 16-14112, 2019 WL 2482092 (11th Cir. June 14, 2019). In doing so, the court described the objective reasonableness standard, and applied "the six Fourth Amendment excessive-force factors" to the facts of the case. Id. at *11. The court stated, in pertinent part:

> The Fourth Amendment's "objective reasonableness" standard governs our inquiry. Crenshaw,[7] 556 F.3d at 1290 (citation omitted). Under this standard, we must consider "whether the officer's conduct is objectively reasonable in light of the facts confronting the officer." Id. (quoting Vinyard v. Wilson, 311 F.3d 1340, 1347 (11th Cir. 2002)) (internal quotation marks omitted). When we conduct our analysis, we must do so "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," id. (quoting Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)) (internal quotation marks omitted), and we acknowledge that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham, 490 U.S. at 396, 109 S.Ct. 1865 (citation omitted).
>
> In applying this standard, we carefully balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Crenshaw, 556 F.3d at 1290 (quoting Graham, 490 U.S. at

---

[7] Crenshaw v. Lister, 556 F.3d 1283 (11th Cir. 2009) (per curiam).

396, 109 S.Ct. 1865) (internal quotation marks
omitted). We have explained that "the amount
of force used by an officer in seizing and
arresting a suspect must be reasonably
proportionate to the need for that force."
Stephens v. DeGiovanni, 852 F.3d 1298, 1324
(11th Cir. 2017) . . . . **Factors we account
for in making this assessment include (1) the
severity of the crime; (2) whether the
individual "poses an immediate threat to the
safety of the officers or others," Crenshaw,
556 F.3d at 1290 (quoting Graham, 490 U.S. at
396, 109 S.Ct. 1865) (quotation
marks omitted); (3) whether the individual actively
resists or tries to evade arrest by flight,
id.; (4) the need for force to be applied; (5)
the amount of force applied in light of the
nature of the need; and (6) the severity of
the injury.**[8]

We have further elaborated on some of
these factors. For example, "[t]he nature and
extent of physical injuries sustained by a
plaintiff" can be relevant in evaluating
"whether the amount and type of force used by
the arresting officer were excessive."
Stephens, 852 F.3d at 1325 (emphasis omitted).

---

[8] Notably, the court explained:

At times in our caselaw, we have identified
another factor: whether officers applied force
"in good faith or [rather did so] maliciously
and sadistically." Hadley v. Gutierrez, 526
F.3d 1324, 1329 (11th Cir. 2008). As we
explained in Mobley v. Palm Beach County
Sheriff Department, 783 F.3d 1347, 1354 (11th
Cir. 2015), however, that caselaw is not
correct. Because the test we apply asks
whether an officer's actions in using force
were objectively reasonable, the test is not a
subjective one. Id. So we do not consider an
officer's subjective intent in applying force.
Id.

Hinson, 2019 WL 2482092, at *9 n.9.

> Nevertheless, we have cautioned that "[w]hen
> more force is required to effect an arrest
> without endangering officer safety, the
> suspect will likely suffer more severe injury,
> but that alone does not make the use of that
> amount of force unreasonable." <u>Mobley v. Palm
> Beach Cty. Sheriff Dep't</u>, 783 F.3d 1347, 1356
> (11th Cir. 2015) (per curiam).

<u>Id.</u> at *9-10 (emphasis added and footnote omitted).

The first <u>Graham</u> factor, "the severity of the crime at issue,"
weighs in favor of a finding that Detective Thompkins' use of force
was reasonable. 490 U.S. at 396. As Austin's allegations in the AC
make plain, from the beginning of the April 11, 2014 encounter,
Detective Thompkins believed he was dealing with a suspect who was
involved in felonious criminal drug activity. Significantly, the
State charged Austin with sale of cannabis, possession of cocaine,
and possession of less than twenty grams of cannabis for offenses
he committed that day. <u>See</u> https://core.duvalclerk.com, case number
16-2014-CF-003469-AXXX-MA, docket entry 116, Amended Information,
filed September 5, 2014.[9] Notably, the crimes of sale of cannabis
and possession of cocaine are third degree felonies in violation of

---

[9] Austin asserts that the State dropped the sale of marijuana
charge. <u>See</u> AC at 6. However, the state court record reflects that
Austin proceeded to a trial by jury on an Amended Information,
which included a charge for sale of cannabis (count one). <u>See</u>
https://core.duvalclerk.com, case number 16-2014-CF-003469-AXXX-MA,
docket entry 116. A jury ultimately found Austin guilty of the
three offenses on September 19, 2014, and the trial court sentenced
him on November 14, 2014, to a term of imprisonment of ten years
for sale of cannabis, a term of imprisonment of five years for
possession of cocaine, and for time served for possession of less
than twenty grams of cannabis. <u>See id.</u>, docket entry 217, Judgment.

Florida Statutes sections 893.13(1)(a)2, and 893.13(6)(a).[10] As he acknowledges in the AC, Austin has been serving the terms of incarceration in FDOC custody since December 3, 2014. <u>See</u> AC at 10; http://www.dc.state.fl.us/offender/Search/detail.aspx (last visited July 17, 2019).

The second <u>Graham</u> factor, "whether the suspect poses an immediate threat to the safety of the officers or others," 490 U.S. at 396, also weighs in favor of a finding that Detective Thompkins' application of force was reasonable. According to Austin, when they pointed guns at him, he attempted to run towards them. <u>See</u> AC at 5. In light of Austin's screaming and unpredictable movement towards the armed officers, a reasonable officer certainly could have perceived Austin as an immediate threat to the officers. Thus, taking Austin's allegations as true, as the Court must, Thompkins not only had reason to fear that Austin could pose a danger to him, but that Austin could also threaten the safety of others as well.

The third <u>Graham</u> factor, "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight," 490 U.S. at 396, also weighs in favor of a conclusion that Detective Thompkins' use of force was not unreasonable. Any reasonable officer could have construed Austin's running and screaming to be either an offensive move toward armed officers or an attempt to

---

[10] <u>See</u> 2019 Fla. Sess. Law Serv. Ch. 2019-3 (S.B.4) (amending Fla. Stat. § 893.13(7)(a)).

flee the scene. As such, an officer reasonably could have believed that a stop tactic was needed to avoid potential harm to himself and others. As the Supreme Court has explained, "[t]he attempt to elude capture is a direct challenge to an officer's authority" and "gives the officer reason to believe that the [suspect] has something more serious . . . to hide." Sykes v. United States, 564 U.S. 1, 9 (2011), overruled on other grounds, Johnson v. United States, 135 S. Ct. 2551 (2015).

As such, all three Graham factors - the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is attempting to resist arrest or evade capture by flight - weigh in Detective Thompkins' favor. The Court, however, does not end its inquiry there. The Eleventh Circuit also instructs district courts to consider three other factors: (1) "the need for force to be applied"; (2) "the amount of force applied in light of the nature of the need"; and (3) "the severity of the injury." Hinson, 2019 WL 2482092, at *9 (footnote omitted). The Court will refer to these as the Hinson factors.

The first Hinson factor - the need for the application of force - is answered by the Graham factors themselves. The fact that the officers were arresting Austin for committing felonious acts, and that Detective Thompkins reasonably could have believed that Austin screaming and running toward armed officers threatened the

safety of the officers, and/or that Austin was either fleeing or resisting an arrest, all suggest that there was a need to stop Austin's approach towards the officers. Next, the second <u>Hinson</u> factor - the relationship between the need and the amount of force used - is perhaps the central question, and it especially weighs in favor of a conclusion that Detective Thompkins' use of force was reasonable. Under these circumstances, a reasonable officer certainly could conclude that the minimal amount of force Thompkins applied - tripping Austin and causing him to fall to the ground to stop him from running towards officers - was appropriate.

Finally, the third <u>Hinson</u> factor - the severity of the injury - is neutral on the facts before the Court. Taking Austin's assertions as true, as the Court must, Austin re-injured his shoulder when he fell to the ground. Notably, regardless of how serious Austin asserts his shoulder injury to be, it was the result of Detective Thompkins' proportionate use of force against an unpredictable, moving suspect. Austin states that Thompkins should have known about his shoulder injury because his surgical scars were visible, and he shouted "my arm[,] my arm." AC at 5. However, Austin neither asserts nor suggests that Detective Thompkins knew the extent of his shoulder injury, but still chose to use a level of force that would aggravate the preexisting shoulder injury. The Eleventh Circuit has stated:

> We do not use hindsight to judge the acts of
> police officers; we look at what they knew (or

> reasonably should have known) at the time of
> the act. What would ordinarily be considered
> reasonable force does not become excessive
> force when the force aggravates (however
> severely) a pre-existing condition the extent
> of which was unknown to the officer at the
> time. See Silverman,[11] 694 F.2d at 1096–97
> (concluding that force used was not, as a
> matter of law, excessive even though arrestee
> died of heart attack during arrest).

Rodriquez v. Farrell, 280 F.3d 1341, 1352-53 (11th Cir. 2002).

Accordingly, the Court determines that Austin has failed to state

a plausible Fourth Amendment excessive-use-of-force claim against

Detective Thompkins. Accordingly, Thompkins' Motion is due to be

granted.[12]

## B. Fourteenth Amendment Deliberate Indifference Claims

Austin asserts that Defendants Anderson, Valerio, and Barnes

violated his Eighth Amendment right when they were deliberately

indifferent to his medical needs. See AC at 4. He avers that

Defendant Anderson read him his Miranda[13] rights and interviewed

him, and Defendant Valerio transported him to the Jail instead of

---

[11] Silverman v. Ballantine, 694 F.2d 1091, 1096–97 (7th Cir. 1982).

[12] The Court need not consider the issue of qualified immunity because it has determined there was no federal constitutional violation. However, if the Court did address the issue, it would find that Detective Thompkins is entitled to qualified immunity for the same reason. See Hinson, 2019 WL 2482092, at *9–12; Garczynski v. Bradshaw, 573 F.3d 1158, 1170 (11th Cir. 2009) ("No constitutional violation occurred. Without this element, we need not assess whether the alleged violation was clearly established.").

[13] Miranda v. Arizona, 384 U.S. 436 (1966).

taking him directly to the emergency room. See AC at 6. He states that he was in the garage for forty-five minutes, and saw the Jail intake nurse after he was searched and "dressed out." Id. He avers that his shoulder bone was "sticking up" and his left shoulder was swollen when he saw the intake nurse. Id. According to Austin, Defendant Barnes saw him the following week, and referred him to an orthopedic doctor, whom he saw on May 2, 2014. Id. at 6-7. Defendants maintain that Austin fails to state plausible deliberate indifference claims against them, and that they are entitled to qualified immunity.

Preliminarily, the Court notes that the Eighth Amendment does not apply to Austin as a pretrial detainee at the Jail. See Nam Dang by & through Vina Dang v. Sheriff, Seminole Cty. Fla., 871 F.3d 1272, 1279 (11th Cir. 2017). Nevertheless, the standard for providing basic human needs and a safe environment to those incarcerated or in detention is the same under both the Eighth and Fourteenth Amendments. Id.; see Smith v. Franklin Cty., 762 F. App'x 885, 889 (11th Cir. 2019) (per curiam); Johnson v. Bessemer, Ala., City of, 741 F. App'x 694, 699 n.5 (11th Cir. 2018) (per curiam) (stating that Kingsley v. Hendrickson, 135 S.Ct. 2466 (2015),[14] involving a pretrial detainee's excessive force claim, "does not undermine our earlier Eighth Amendment deliberate

---

[14] The United States Supreme Court held that "the appropriate standard for a pretrial detainee's excessive force claim is solely an objective one." Kingsley, 135 S.Ct. at 2473.

indifference precedents"); <u>Goodman v. Kimbrough</u>, 718 F.3d 1325, 1331 n.1 (11th Cir. 2013) ("Regardless of the particular taxonomy under which we analyze the case, however, the result is the same, because 'the standards under the Fourteenth Amendment are identical to those under the Eighth.'") (citation omitted).

The Eleventh Circuit has explained the requirements for a claim of constitutionally inadequate care:

> "The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones . . . ." <u>Farmer</u>, 511 U.S. at 832, 114 S.Ct. at 1976 (internal quotation and citation omitted).[15] Thus, in its prohibition of "cruel and unusual punishments," the Eighth Amendment requires that prison officials provide humane conditions of confinement. <u>Id.</u> However, as noted above, only those conditions which objectively amount to an "extreme deprivation" violating contemporary standards of decency are subject to Eighth Amendment scrutiny. <u>Hudson</u>, 503 U.S. at 8-9, 112 S.Ct. at 1000.[16] Furthermore, it is only a prison official's subjective deliberate indifference to the substantial risk of serious harm caused by such conditions that gives rise to an Eighth Amendment violation. <u>Farmer</u>, 511 U.S. at 828, 114 S.Ct. at 1974 (quotation and citation omitted); <u>Wilson</u>, 501 U.S. at 303, 111 S.Ct. at 2327.[17]

<u>Thomas v. Bryant</u>, 614 F.3d 1288, 1306-07 (11th Cir. 2010). "To show that a prison official acted with deliberate indifference to serious medical needs, a plaintiff must satisfy both an objective

---

[15] <u>Farmer v. Brennan</u>, 511 U.S. 825 (1994).

[16] <u>Hudson v. McMillian</u>, 503 U.S. 1 (1992).

[17] <u>Wilson v. Seiter</u>, 501 U.S. 294 (1991).

and a subjective inquiry." <u>Brown v. Johnson</u>, 387 F.3d 1344, 1351 (11th Cir. 2004) (quoting <u>Farrow v. West</u>, 320 F.3d 1235, 1243 (11th Cir. 2003)). First, the plaintiff must satisfy the objective component by showing that he had a serious medical need. <u>Goebert v. Lee Cty.</u>, 510 F.3d 1312, 1326 (11th Cir. 2007).

> "A serious medical need is considered 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" <u>Id.</u> (citing <u>Hill v. Dekalb Reg'l Youth Det. Ctr.</u>, 40 F.3d 1176, 1187 (11th Cir. 1994)). In either case, "the medical need must be one that, if left unattended, pos[es] a substantial risk of serious harm." <u>Id.</u> (citation and internal quotations marks omitted).

<u>Brown</u>, 387 F.3d at 1351. Next, the plaintiff must satisfy the subjective component, which requires the plaintiff to "allege that the prison official, at a minimum, acted with a state of mind that constituted deliberate indifference." <u>Richardson v. Johnson</u>, 598 F.3d 734, 737 (11th Cir. 2010) (per curiam) (describing the three components of deliberate indifference as "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence") (citing <u>Farrow</u>, 320 F.3d at 1245); <u>Lane v. Philban</u>, 835 F.3d 1302, 1308 (11th Cir. 2016) (setting forth the three components) (citing <u>Farrow</u>, 320 F.3d at 1245).

In _Estelle_[18], the Supreme Court established that "deliberate indifference" entails more than mere negligence. _Estelle_, 429 U.S. at 106, 97 S.Ct. 285; _Farmer_, 511 U.S. at 835, 114 S.Ct. 1970. The Supreme Court clarified the "deliberate indifference" standard in _Farmer_ by holding that a prison official cannot be found deliberately indifferent under the Eighth Amendment "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." _Farmer_, 511 U.S. at 837, 114 S.Ct. 1970 (emphasis added). In interpreting _Farmer_ and _Estelle_, this Court explained in _McElligott_[19] that "deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." _McElligott_, 182 F.3d at 1255; _Taylor_,[20] 221 F.3d at 1258 (stating that defendant must have subjective awareness of an "objectively serious need" and that his response must constitute "an objectively insufficient response to that need").

_Farrow_, 320 F.3d at 1245-46.

According to Austin's own allegations, any delay in the Jail's provision of medical care was partially due to custodial events relating to the reading of his _Miranda_ rights, interrogation, and the taking of photographs as well as his transportation to the Jail. _See_ AC at 6. Austin states that he "had just taken" Percocet before his interaction with law enforcement, and therefore was

---

[18] _Estelle v. Gamble_, 429 U.S. 97 (1976).

[19] _McElligott v. Foley_, 182 F.3d 1248 (11th Cir. 1999).

[20] _Taylor v. Adams_, 221 F.3d 1254 (11th Cir. 2000).

concerned that his medication would wear off before the Jail intake nurses could provide more pain medication. Id. To the extent Austin avers that Defendants Valerio and Anderson delayed his medical treatment, he neither asserts any deliberateness on Defendants' part nor that the delay worsened his physical injuries. Colardo-Keen v. Rockdale Cty, Ga., No. 17-13505, 2019 WL 2245922, at *10 (11th Cir. May 24, 2019). Austin asserts that he saw three intake nurses upon entry to the Jail that same day, and that Barnes attended to his medical needs the following week. See AC at 6-7.

As to any complaints about Defendant Barnes' negligent acts and unprofessional conduct in providing allegedly substandard medical care and failing to send his medical records to the FDOC, the law is well settled that the Constitution is not implicated by the negligent acts of corrections officials and medical personnel. Daniels v. Williams, 474 U.S. 327, 330-31 (1986); Davidson v. Cannon, 474 U.S. 344, 348 (1986) ("As we held in Daniels, the protections of the Due Process Clause, whether procedural or substantive, are just not triggered by lack of due care by prison officials."). A complaint that a physician has been negligent "in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." Bingham v. Thomas, 654 F.3d 1171, 1176 (11th Cir. 2011) (per curiam) (quotation marks and citation omitted). While Plaintiff's allegations may suggest medical malpractice, "[a]ccidents, mistakes, negligence, and medical malpractice are not

24

'constitutional violation[s] merely because the victim is a prisoner.'" <u>Harris v. Coweta Cty.</u>, 21 F.3d 388, 393 (11th Cir. 1994) (citing <u>Estelle</u>, 429 U.S. at 106). Consequently, the allegedly negligent conduct of Barnes about which Austin complains does not rise to the level of a federal constitutional violation and provides no basis for relief in this 42 U.S.C. § 1983 action.

Notably, Austin states that he needed stronger pain medication, proper physical therapy, and the brace that Dr. Murphy advised him to wear. The United States Supreme Court has stated:

> [T]he question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most[,] it is medical malpractice, and as such the proper forum is the state court . . . .

<u>Estelle</u>, 429 U.S. at 107; <u>Adams v. Poag</u>, 61 F.3d 1537, 1545 (11th Cir. 1995) ("[T]he question of whether [Defendant Barnes] should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment."). "Nor does a simple difference in medical opinion as to [Austin's] diagnosis or course of treatment support a claim of cruel and unusual punishment." <u>Harris v. Thigpen</u>, 941 F.2d 1495, 1505 (11th Cir. 1991) (citation omitted). Moreover, medical treatment violates the Constitution only when it is "so grossly incompetent, inadequate, or excessive as to shock

25

the conscience or to be intolerable to fundamental fairness."

<u>Rogers</u>, 792 F.2d at 1058 (citation omitted)). Taking Austin's

assertions as true, as the Court must, he fails to state plausible

deliberate indifference claims against Defendants Valerio,

Anderson, and Barnes. Thus, Defendants' Motions are due to be

granted as to Austin's Fourteenth Amendment deliberate indifference

claims against them.

### C. Fourteenth Amendment Excessive Force Claim Against Defendant Barnes

Austin asserts that Defendant Barnes directed Jail officers to

take his brace when he refused to surrender it to her. <u>See</u> AC at 9,

¶ 27; Doc. 5-6 at 1, Health Care Grievance Form (stating Dr. Barnes

authorized the use of force), dated October 29, 2014. In the AC,

Austin describes the events leading up to the Jail officers' use of

force against him.

> In September I have an appointment at
> Shands Jacksonville. This time it's a
> different orthopedic doctor who gives me
> another x-ray but he doesn't have the x-rays
> from He[e]kin orthopedic Doctor Murphy like
> Dr. Toole did. He looks at the x-rays and says
> that Dr. Toole was wrong[.] [I]t's not a
> clavicle separation but a re-injury to ... my
> A.C.[] He told me that they don't do re-injury
> surgeries.
>
> This doctor also told me that I need to
> stop wearing the brace before my shoulder
> get[s] stiff and I should continue to do the
> exercises and he couldn't give me anything for
> pain because Jacksonville Sheriff's Office
> policy won't allow him to.

Then on October 8th 2014 about 9:30 am and 10:30 am I was called to the jail[']s M-2 clinic[] [t]o see Doctor Barnes[.] [U]pon entering the M-2 clinic when I got off the elevator I see more correctional officers th[a]n usual[.] I see 4 in the control booth and two in the hallway by Doctor Barnes['] office[,] and the camera in the [h]all would prove this.

I walk into Dr. Barnes['] office and sit down[.] [S]he immediately tells me that the Doctor at Shands says that I need to take off the ultra-sling II from He[e]kin orthopedics and give it to her to be placed in my property. I told Dr. Barnes that the doctor at Shands w[as] th[eir] doctor and he can't authorize me to take off the sling when He[e]kin orthopedic Dr. Murphy told me to wear the sling so I don't further injure my shoulder and she was the one he told that to. I also told Dr. Barnes when doctor Murphy tell[s] me to not wear i[t] then I won't[.] [U]ntil then[,] I'm going back to my dorm.

When I reached the hallways[,] the two officer[]s that were sitting by her door w[ere] still there[.] **[T]hen Dr. Barnes yelled to them to take the brace from me[.]** [O]ne of the officer[]s didn't waste any time. He tackled me to the ground and the other officer began to twist my arm and fingers while I was on my back they kicked me in my testicles, kneed me in my lower back while trying to get my brace.

AC at 9 (emphasis added). Defendant Barnes maintains that Austin fails to state a plausible Fourteenth Amendment excessive-force claim against her because he neither asserts that she used force against him nor that she directed the Jail officers to use excessive force against him. See Barnes' Motion at 5.

The Supreme Court has clarified that a pretrial detainee raising a Fourteenth Amendment excessive-force claim does not need to prove an officer's subjective intent to harm, but instead "must show only that the force purposely or knowingly used against him was objectively unreasonable." Kingsley, 135 S.Ct. at 2473; see Piazza v. Jefferson Cty., Ala., 923 F.3d 947, 952 (11th Cir. 2019). Notably, "the Fourteenth Amendment standard has come to resemble the test that governs excessive-force claims brought by arrestees under the Fourth Amendment." Piazza, 923 F.3d at 953 (citations omitted).

According to Austin's own allegations, he refused to comply with Dr. Barnes' request to surrender the brace because Dr. Murphy had advised him to wear the brace. See AC at 9. According to Austin, his preference was to rely on his own doctor's advice, not that of the Shands doctor, whom he referred to as their doctor. See id. Taking Austin's assertions as true, Barnes initially sought Austin's cooperation by asking Austin to surrender the brace based on the advice of a Shands doctor. When Austin refused to comply and left the medical office without surrendering the brace, Barnes' direction to the officers to take the brace was a reasonable measure to ensure that Austin followed the advice of Jail medical personnel who had determined that the brace would stiffen his shoulder.

Under circumstances that were rapidly evolving, the Jail officers initiated physical contact with Austin for a legitimate

medical purpose – the taking of a brace that could prove detrimental to Austin's health. Austin neither asserts that Defendant Barnes was involved in the actual taking of the brace, that she directed the officers to use forceful means to retrieve the brace, nor watched as the officers used excessive force against him. Thus, taking Austin's allegations as true, as the Court must, he fails to state a plausible excessive-force claim against Defendant Barnes. Thus, Defendant Barnes' Motion is due to be granted.[21]

## D. Plaintiff's Request to Amend

Austin requests the Court's permission to amend his AC. <u>See</u> Responses, Docs. 36 at 9; 42 at 4-5. Preliminarily, the Court notes that a request for affirmative relief, such as a request for leave to amend a pleading, is not properly made when simply included in a response to a motion. <u>See</u> Fed. R. Civ. P. 7(b); <u>see also</u> <u>Rosenberg v. Gould</u>, 554 F.3d 962, 965 (11th Cir. 2009) ("Where a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly.") (quoting <u>Posner v. Essex Ins. Co.</u>, 178 F.3d 1209, 1222 (11th Cir. 1999)).

Moreover, even if it were proper to include such a request in the Responses, the request is otherwise due to be denied for

---

[21] For this same reason, Defendant Barnes' assertion of her right to qualified immunity would provide an alternative basis for dismissal.

failure to comply with Local Rules 3.01(a) and 3.01(g), United States District Court, Middle District of Florida (Local Rule(s)). Local Rule 3.01(a) requires a memorandum of legal authority in support of a request from the Court. See Local Rule 3.01(a). Local Rule 3.01(g) requires certification that the moving party has conferred with opposing counsel in a good faith effort to resolve the issue raised by the motion and advising the Court whether opposing counsel agrees to the relief requested. See Local Rule 3.01(g). In addition to these deficiencies under the Local Rules, the request in the Responses also fails to satisfy the requirement that "[a] motion for leave to amend should either set forth the substance of the proposed amendment or attach a copy of the proposed amendment." Long v. Satz, 181 F.3d 1275, 1279 (11th Cir. 1999); see also McGinley v. Fla. Dep't of Highway Safety and Motor Vehicles, 438 F. App'x 754, 757 (11th Cir. 2011) (affirming denial of leave to amend where plaintiff did not set forth the substance of the proposed amendment); United States ex. rel. Atkins v. McInteer, 470 F.3d 1350, 1361-62 (11th Cir. 2006) (same). Thus, the Court will not entertain Austin's request for relief included in the Responses.

Therefore, it is now

**ORDERED AND ADJUDGED:**

1.     Defendants Valerio and Anderson's Motion to Dismiss (Doc. 21), Defendant Thompkins' Motion to Dismiss (Doc. 34), and Defendant Barnes' Motion to Dismiss (Doc. 35) are **GRANTED**, and Plaintiff's claims against them are **DISMISSED**.

2.     The Clerk of Court shall enter judgment dismissing this case with prejudice.

3.     The Clerk shall terminate any pending motions and close the case.

**DONE AND ORDERED** at Jacksonville, Florida, this 18th day of July, 2019.


**MARCIA MORALES HOWARD**
United States District Judge


sc 7/17
c:
Anthony L. Austin, FDOC #301298
Counsel of Record